Alvin Hawkins, J.,
delivered the opinion of the Court.
John Pope, of Shelby county, made and published his will on the 13th of January, 1863. On the 2d of February thereafter, he made a codicil thereto, and died, leaving the same in full force, in March, 1865.
The will, in general terms, direct that all his esstate, real and personal, be sold as soon as practicable, or as soon as the then existing war should cease, and civil order be restored, upon such terms as might be deemed most advisable and consistent with the interest of his legatees; but that the executors might reserve from sale so much of the testator’s silver plate, books, pictures, engravings, etc., as they might think proper; also, two favorite *543 house servants; and each of his sons .might also select and receive one servant.
The will further provides that his wife and sons might, by mutuai agreement, occupy his homestead, reserving fifteen or twenty acres for several years before it be sold.
Testator gave all his estate, real and personal, to his wife, Clara, and his five sons — Andrew, Willie, Monte-rey, Walter Scott, and Louis Eugene — children by a former marriage, “to be equally distributed, according to the statutory laws of the State of Tennessee;” with the proviso that “my executors shall pay annually, out of the income of my estate, if it be hot very seriously impaired by the war, five hundred dollars, to support my daughter, Maria Morgan, and her three children; and three hundred, do support the children of Dr. John Pope, deceased.”
The testator then directs that'his lands be sub-divided into small tracts, and sold on the following terms: one-third cash, balance on one and two years’ time; and that his negroes and stock be sold for cash.
Testator appointed his wife, Clara, and his son, Andrew R., executors of his will; and directed that they qualify without being required to give bond as such.
By the codicil, the testator directs that the property, or the proceeds of the same, as. bequeathed to his surviving sons, be divided among them as- they became of age; and until then, that they be maintained and educated out of the proceeds arising from it.
The will and codicil were admitted to probate by the County Court of Shelby county, at the July Term, 1865; *544 and at the same term, said executors were qualified without giving surety.
The testator'had been married■> three times. The complainant, Maria P., and Dr. John Pope, mentioned in the will, were children of the first marriage. The five sons to whom, together with his third wife, Clara, the testator gave the bulk of his estate, were children of his second marriage. It does not appear that he had any children by his last marriage.
At the breaking out of the war in 1861, the testator was the owner of a large real and personal estate, consisting in part of some seventy or eighty slaves, worth about $60,000. During the progress of the war, and before the date of the will, slave property had decreased in value, and at the date of the will slaves were not worth more than one-fourth their value at the breaking out of the war.
Before the date of the will, a portion of the slaves belonging to the testator at the breaking out of the war, amounting in value to about one-fourth of the value of the entire lot, had abandoned his services; and it appears from this record that at the date of the will the testator regarded slaves as of but little value, and in fact the institution of slavery as virtually abolished.
In 1863, he said if he could secure two crops of cotton at the then existing prices, the negroes might go, and he would be satisfied. He did secure the crops of 1863 and of 1864, and sold them at greatly enhanced prices.
Prior to the date of the will, testator’s estate had sustained some loss, but how much does not satisfactorily appear, from the burning of some cotton. He also lost *545 during the war, by the impressment of corn and stock, and feeding soldiers, about $2,000;.a part of this loss was sustained before, and the balance after the making of his will; but what proportion before or after that date, does not appear.
At the breaking out of the war, the testator was the owner of a tract of land containing about four hundred acres, situated about four miles from the city of Memphis, upon which he lived; also, a tract .containing 1,140 acres, situated about twenty-seven miles east of Memphis; also, some lots in the suburbs of the city. All of which, except, perhaps, one of the lots, which, before the date of the will, he had given to his daughter, Maria P., he continued to own up to the time of his death.
In consequence of the war and. its results, real estate in and near the city of Memphis was greatly enhanced in value; and in October, 1866, (the date of taking the depositions in this cause,) it was worth from 75 to 100 per cent, more than it was before the war.
Two very intelligent witnesses, Mr. Miller and Mr. Holmes, have been examined as to the value of testator’s estate at the breaking out of the war, at the date of the will, and at the date of giving their depositions; and it appears from their testimony that the testator’s whole estate, in 1866, was worth as much, or within ten or fifteen thousand dollars of as much, as his whole estate, including the slaves, was worth in April, 1861, and about fifty thousand dollars more than his estate wás worth at the date of the will, leaving the slaves out- of the estimate at the latter date.
After the execution of the will, and before the death *546 of testator, one of the children of complainant, Maria P., died, at the age of about five years.
On the 23rd of March, 1866, about one year after the death of the testator, no portions of the legacy given to testator’s daughter, Maria P., and her children, having been paid, or fund set apart to secure the same, the said Maria P., and her two surviving children, filed their bills in the Chancery Court at Memphis, against the executors of the will, and the legatees under the will, except the children of Dr. John Pope, seeking a construction of the will, and a payment of the legacy of |500 per ahnum.
The will must be construed according to the intention of "the testator; and in order to ascertain his intention, we must place ourselves as nearly as may be, in his situation, and look to the circumstances surrounding him at the time. He was a man of fortune, and from all that appears in this record, wholly unembarrassed. -His daughter, Maria P., had been unfortunate in marriage; had separated from her husband, and returned, with her children, to the house of her father. From there she went to the house of her brother-in-law, Miller. Testator agreed to pay Miller $600 a year towards the support of his daughter and her children, which he continued to do until he died — the last payment being at the rate of $700 per annum, the amount Miller had insisted upon in the first instance. She was almost, if not entirely, dependent upon the bounty of her relations for the means of support for herself and her children. In the meantime, her husband had fallen in battle, and she was left a widow.
Complainants insist that the legacy of $500 per an- *547 num, for their support, is a perpetual annuity; and, therefore, it is, in effect, an absolute gift of so much money as will raise $500 per annum.
It is certainly true, upon authority, as insisted in argument, that a devise of the rents and profits of an estate is equivalent to a devise of the estate itself; and that a gift, without limit as to time of the producer of a particular fund, amounts to a gift of ■ the fund itself. But it is also true, if expressions are to be found showing an intention that the gift of the produce should be limited as to time, such limit will be the measure of the gift. It must also be borne in mind, there is a marked distinction between a gift of the produce of a fund without limit as to time,' and a simple gift of an annuity which before had no existence. An annuity may be perpetual, or for life, or for a period of years, or subject to such specific limitations as to its duration as the grantor or donor may impose.
This is not a gift of the produce of a fund, nor of the fund itself; it is the gift of an annuity of $500, which had no existence before, and is' to be paid out of the income of the whole estate, for the support of the testator’s daughter and her children. The annuity is charged upon the income of the estate only, and not upon the corpus thereof. It is given for a specific purpose, viz: the support of the donee and her children.
"We are of the opinion the .annuity is not a perpetual one. It is an aggregate fund, intendéd for the joint support of Mbs. Morgan and her children; and as they require support so long as they may live, we think they are entitled to the annuity so long as they may live; and *548 in case of the death of one or more, it goes to the survivors or survivor, for the purposes of the bequest.
It is insisted by the defendants, that the legacy to complainants must fail, because, 'as they insist, the estate of the testator was very seriously impaired by the then existing war.
It is true, the emancipation of his slaves was one of the consequences of the war, but their value had greatly diminished before the date of the will; and the proof shows that, at that time, he considered them of but very little, if any, value. The loss, then, in the value of his slaves, had been principally, if not entirely, sustained before the making of the will. His personal estate sustained, also, other losses in consequence of the war — most of which, however, was before the making of the will. These losses were well known to and fully appreciated by the testator, at the time of making his will; and to them he could have had no reference in making this bequest. He had reference to the aggregate value of his estate at the time of making his will, and the legacy was measured by its ability to pay at that time.
The will, we think, must be construed as though it read: “ My executors shall pay, annually, out of the income of my estate, if it be not hereafter very seriously impaired by the war, five hundred dollars, to support my daughter, Maria Morgan, and her three children.” But, if we are mistaken in this view, we tl)ink the result, must be the same, inasmuch as the record shows that, in consequence of the war, the testator was enabled to sell three crops of cotton, averaging eighty bales each, at greatly enhanced prices, and his real estate was greatly enhanced *549 in value; so that after the close of the war, his estate was worth, in the aggregate, nearly or quite as much as at tbe breaking out of the war,, in 1861. If there was, in fact, any impairment of the value, it was but trifling, when compared with the value of his large estate, and could not very seriously diminish its ability to pay this legacy.
We do not think the testator’s ’ estate was “very seriously impaired by the war,” so as to defeat the legacy to complainants; and we are strengthened in this view of the subject by the fact that the record shows that the testator, at the date of the will,' and when his estate was worth from $30,000 to $50,000 less than in 1866, after the close of the war, was paying annually a sum larger than the annuity, and for precisely the same purpose for which the annuity was given. Under these circumstances, we think to hold the annuity given by the testator, for the support of his daughter and ■ her children, had failed, would be doing violence to his clearly ascertained intention, and leaving the objects of his bounty, for whom he had manifested the most anxious solicitude, without the support which he provided for them during his life, when his estate was worth less than now, and which he evidently intended to continue after his death.
The next question is, when did the legacy become due? It is well settled as to a general legacy charged upon personal estate, in case the testator indicated no time when the legacy shall be paid, that, by a rule of law, it carries interest from the expiration of one year from the death of the testator, and from that period the legatee is entitled to interest upon the legacy. But the weight of authority *550 is, that a different rule applies in cases where it is apparent the legacy was intended to provide an immediate support for the legatee, and in such cases the legacies carry interest from the death of the testator. Ordinarily, a legacy to be paid in the form of an annuity, is in some sense, due at the end of one year from the death of the testator; but we apprehend this rule would be subject to the same exceptions as in case of a general legacy, if it was apparent the gift of the annuity was intended to provide the annuitant with the means of an immediate support. But be this as it may, it can make no difference in this case, inasmuch as the annuity, instead of being charged upon the capital, is charged upon the income of the estate, and therefore, although the annuity was intended for the support of the annuitants, the first payments would not, in any sense, become due, so as to carry interest, until the expiration of one year from ‘the death of the testator.
The testator directed that his estate, both real and personal, be,sold, and that the annuity be paid out of the income. The annuity is, therefore, charged upon personal estate; and in such cases, courts of equity will, according to the modern and generally more' approved practice, order the fund to be paid into court, even though there be no actual waste or danger of waste.
It is said in argument, the annuitants are not entitled to the legacy until an income has been actually realized, and that none has been realized. How the fact may be, the record fails to disclose; but let it be as it may, it can make no difference as to the rights of complainants.
It appears from the inventory of the estate of the tes *551 tator, made by tbe executors, that there was on hand at the death of testator, in cash,-upwards of $26,000, from which an. income might, and ought to have been derived.
He also directed that his estate, both real aud personal, with some trifling exceptions, be sold as soon as the war ceased and civil order was restored, the personalty for cash, the realty for one-third cash. The war ceased, and civil order was restored in 1865. . So, it is very apparent from this record, if the executors had done their duty, their would have been at this time, income in the hands of the executors amply sufficient to pay off the ar-rearages of the annuity, with -the 'accruing interest and other charges upon the same fund. It was the duty of the executors so to have disposed of the estate as to have produced an income; and their failure to have complied with this duty can not prejudice the rights of the annuitants. It was clearly the duty of the executors to have set apart a sufficiency of the estate to have produced the income to which the annuitants were entitled; and it is also clear, that, for any failure to have performed their duty as such executors, whereby the estate has been injured, they may be made personally liable to the general legatees.
It appears from this record, that, in further performance of 'the agreement of the testator with Miller, to pay $600 per annum toward the support of the com-palinants, the executors have paid various sums for that purpose. These 'payments must be credited upon the arrears of the annuity, and the balance decreed for the complainants.
*552 A sufficiency of the corpus of the estate to raise annually the sum. of five hundred dollars will be paid into court, to be loaned out or invested under the orders of the Court, and the income thereof, to the amount of the annuity paid over to the complainants, or applied, under the orders of the Court, to the purposes of the annuity.
If all the annuitants were of full age, we should have less hesitation in directing that the value of the annuity be ascertained; also, the extent of the income in the hands of the executors; and in case the income was sufficient, to order the value to be paid out of the income, in full discharge of the annuity; but for the protection of the infant annuitants, and because, as we conceive it is more in accordance with the intention of the testator, we will require the fund to be paid into court, as already indicated.
The decree of the Chancellor will be modified, and a decree entered here in accordance with this opinion; and the cause remanded to the Chancery Court at Memphis, where it will be retained for such further orders as may be. necessary.